Argued and submitted December 19, 2014, vacated and remanded October 12, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

THOMAS HARRY BRAY,
*Defendant-Appellant.*

Deschutes County Circuit Court
11FE1078; A153162

383 P3d 883

Kendra M. Matthews argued the cause for appellant. With her on the opening brief were Marc D. Blackman and Ransom Blackman LLP. With her on the reply brief was Ransom Blackman LLP.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before DeVore, Presiding Judge, and Garrett, Judge, and Schuman, Senior Judge.*

* Schuman, S. J., *vice* Ortega, J.

**SCHUMAN, S. J.**

Defendant was convicted of two counts of first-degree rape, two counts of first-degree sodomy, and one count each of strangulation and fourth-degree assault. On appeal, he argues that he was unlawfully denied the right to present material evidence, namely, information regarding internet searches made by the complaining witness, J. In particular, he argues that the trial court erred in refusing to compel the prosecution to obtain, and turn over to him, electronic data in the possession of Google that federal law permitted Google to release to the prosecution but not defendant. He also maintains that the court erred in denying his motion to compel J to comply with a subpoena *duces tecum* requiring her to turn over her computer (or a clone of its hard drive) for an *in camera* inspection for relevant evidence, and in denying his motion to dismiss based on prosecutorial misconduct. We hold that the court erred in denying defendant's motion to compel J to comply with the subpoena *duces tecum*, but otherwise we affirm. We therefore vacate the judgment of the circuit court and remand for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

Defendant, an anesthesiologist and part-time instructor at Central Oregon Community College in Bend, and J, a research chemist, met through an internet dating service. On their first and only encounter, they had drinks together and then walked to defendant's apartment. Some five hours later, J left, having sustained injuries to her jaw, eye, neck, shoulder, upper back, and vaginal area. According to defendant, these injuries resulted from consensual "rough sex." According to J, there was nothing resembling consent; rather, defendant repeatedly spit in her face, slapped her, choked her into unconsciousness, pulled out some of her hair, and raped her vaginally and anally.

After leaving defendant's apartment, J went home, where she sent a text to a friend stating, "[R]emember how I told you about that doctor? I think he raped me last night." She also conducted Google research regarding Oregon criminal law in order to determine whether "what happened between [defendant] and myself counted as rape or not,"

given that she went to his apartment willingly.[1] Then she called the police to report defendant, who was subsequently arrested.

Before trial, defendant sought access to Google records regarding J's search history—the queries that she had entered and the websites that she had visited—for purposes of impeaching her testimony about the internet activity and, consequently, undermining J's credibility. Among other things, defendant suggested that she searched the internet to determine whether defendant was in fact a physician and therefore wealthy enough to falsely sue for rape.[2] He sent a subpoena *duces tecum* to Google requesting J's email from February 22, 2011 to March 31, 2011, as well as "all internet activity and searches conducted by [J], * * * including IP addresses, web searches requested, results, and sites viewed." Google refused, citing the Electronic Communications Privacy Act (the ECPA), 18 USC § 2702(a)(1), which prohibits Google from disclosing the information:

> "[A] person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service[.]"

The ECPA has several exceptions, however, including one that allows disclosure to "a law enforcement agency

---

[1] Confusion about what "counts" as rape is by no means unusual. For example, the Model Penal Code § 213.1 (1985) still defines rape as follows:

> "A male who has sexual intercourse with a female not his wife is guilty of rape if:
>
> "(a) he compels her to submit by force or by threat of imminent death, serious bodily injury, extreme pain or kidnapping, to be inflicted on anyone; or
>
> "(b) he has substantially impaired her power to appraise or control her conduct by administering or employing without her knowledge drugs, intoxicants or other means for the purpose of preventing resistance; or
>
> "(c) the female is unconscious; or
>
> "(d) the female is less than 10 years old."

That provision is not currently the law in any American jurisdiction and is being revised by the American Law Institute. *See* Model Penal Code § 213.1 (Tentative Draft #1 2014).

[2] J did bring a civil action against defendant seeking $2 million in damages. That action is stayed pending the outcome of this criminal case.

*** if the contents *** appear to pertain to the commission of a crime." 18 USC § 2702(b)(7)(A)(ii). Citing that exception, defendant filed a motion asking the court to issue an order compelling the state to obtain the data from Google. After a hearing on that motion, the court concluded that the information defendant was seeking was exculpatory and material.[3] Instead of issuing the order that defendant had requested, however, the court asked the prosecutor to determine whether J would consent to the data's release. *See* 18 USC § 2702(c)(2) (permitting disclosure "with the lawful consent of the customer or subscriber"). When J refused, defendant renewed his motion. The state objected, relying on (among other things) Article I, section 42(1)(c), of the Oregon Constitution, the so-called Crime Victims' Bill of Rights (CVBR), which guarantees to the victim of a crime

> "[t]he right to refuse an interview, deposition or other discovery request by the criminal defendant or other person acting on behalf of the criminal defendant provided, however, that nothing in this paragraph shall restrict any other constitutional right of the defendant to discovery against the state."

The court rejected that argument and issued an order compelling the state to obtain the data from Google and turn it over to defendant within 10 days.

At that point, December 20, 2011, the state began what it later called a protracted "resistance" to the court order. First, at a subsequent hearing on January 24, 2012, the state attempted to convince the court to reconsider the December 20 order. By that time, the judge who issued the order had retired. The new judge declined to revisit the original judge's decision. The state then informed the court that it could not obtain the information from Google without J's internet protocol (IP) address, and that obtaining that address would be costly and inconvenient, although not

---

[3] On appeal, the state asserts that it "does not concede that the evidence at issue is 'exculpatory.' Nonetheless, this brief will assume *arguendo* that it is." The state did not object to that conclusion when it was made; at a subsequent hearing it expressly disavowed contesting the conclusion; and, on appeal, it does not challenge the court's conclusion regarding whether the evidence was exculpatory. It therefore stands, the state's nonconcession to the contrary notwithstanding. *See* 281 Or App at 599.

impossible.[4] The court was not sympathetic and declined to change its decision. It once again ordered the state to obtain and turn over to defendant the Google information, taking whatever measures were necessary to do so.

At a hearing two weeks later, the state, having taken no action as directed by the court's order, told the court that it had not complied with the order because it had learned that attempting to obtain the information would be futile. In support of that assertion, the state produced an "expert" who testified that Google did not retain information for longer than 28 days. The expert was a Bend police officer. His information about Google's policy came from a conversation he had with another police officer, who, in turn, had heard it from one of Google's attorneys, whose name he could not remember.[5]

During a recess shortly thereafter, however, defendant accessed Google's website and discovered that, in fact, Google's policy was to keep data for at least nine months. Either this discovery or something else prompted the court to chastise the state:

> "I'll tell you what I'm really tired of, and I have only been on this case for about a month, but the [c]ourt issued an order, and then when we find out what compliance there's been with the order, I'm just hearing more reasons why you don't want to comply with the order.
>
> "* * * * *
>
> "* * * You want to come into court and say, 'It doesn't matter what Judge Tiktin ordered'; you just don't think it's going to be useful so you're just not going to comply with the order.
>
> "* * * * *
>
> "* * * [I]t's causing me some concern at this point why your office has done nothing.
>
> "* * * * *

---

[4] As it happened, J's IP address was already in the state's possession at the time and had been for more than eight months, although it is not clear when anybody in the district attorney's office discovered it.

[5] Defendant objected to the testimony as hearsay within hearsay. The court overruled the objection. Defendant does not assign error to that ruling.

> "And to be quite honest with you, you may be putting this entire case in jeopardy by the way you're handling this.
>
> "* * * * *
>
> "At [a forthcoming] hearing on April 27[, 2012], the [s]tate will be required to be in complete compliance with all court orders relating to the alleged victim's Google search history or to show cause why the Deputy District Attorney responsible for this case * * * should not be held in contempt of court for any willful violation of the court orders.
>
> "* * * * *
>
> "* * * [W]e've reached the finish on your office just simply saying you're not going to comply with court orders because you don't agree with them. * * * [Y]ou can't just defy a court order."

The court ordered the state to determine J's IP address, without which Google could not provide J's search history. The state refused, so the court ordered the defense to obtain the information and ordered the state to cooperate. The court also ordered the state to send Google a subpoena *duces tecum* and a letter requesting preservation of data.

After another five weeks passed, at another hearing on the Google matter, defendant informed the court that he had discovered J's IP address, and also that the state had been in possession of that address for nearly a year. The defense also pointed out that, after having received the IP address from defendant, the state still had not sent Google a subpoena or preservation letter with that address. The court ordered the state to do so forthwith. Realizing that Google might no longer have the information or refuse to provide it, defendant, as a backup, also asked the court to compel the state to secure J's computer and give it to the court for an *in camera* inspection to determine if it contained relevant evidence. Defendant noted that this request was urgent, because the defense had information derived from J's civil case against defendant indicating that J had either given away the computer, destroyed it, or attempted to delete all relevant information. The court nonetheless denied defendant's request. Subsequently, the state sent Google the subpoena and preservation letter, complete with J's IP address.

At another hearing two weeks later, the state reported that it had heard nothing from Google. At the same hearing, the court ruled on a motion by J, asserting her rights under the CVBR and requesting an order prohibiting defendant from seeking access to her computer and from seeking data in possession of Google. The court rejected her arguments, pointing out that, with respect to J's computer, the court had already ruled that defendant could not subpoena it or obtain it through discovery, and that, with respect to the Google data, defendant was seeking information from Google, not from the victim, J. The state then informed the court that J was going to file an interlocutory appeal of this ruling. *See* ORS 147.537 (authorizing interlocutory appeals from orders issued in a victims' rights case under Article I, section 42). She did so, but the Supreme Court dismissed it as untimely. *State v. Bray*, 352 Or 34, 42-43, 279 P3d 216 (2012) (*Bray I*).

At a status hearing the day following that dismissal, the state informed the court and defendant that, approximately five weeks before the hearing, it had learned from Google that a subpoena would not suffice; to obtain J's search history, Google would need a search warrant. The state had taken no action on that information, however, believing that, under Oregon law, a search warrant could only issue for evidence of a crime—not for exculpatory evidence. The court noted that, in its opinion, the state's belief was not correct, because ORS 133.535(1) authorizes a warrant to obtain "information concerning the commission of a criminal offense." The state did not object to that ruling.[6] The court told the state to apply for a search warrant in any event, indicating that the court would approve it.

Shortly thereafter, defendant filed a motion to dismiss based on prosecutorial misconduct. At the hearing on that motion, the court—the original judge again, serving as a senior judge—denied defendant's motion despite finding "some foot-dragging and delay and resistance or reluctance by the [s]tate to comply with the [c]ourt's order." The court

[6] Neither this court nor the Supreme Court has ruled on the meaning of "concerning the commission" in ORS 133.535(1), and the issue does not arise on this appeal.

also reconsidered its December 20, 2011, decision, and now concluded that the court was powerless to compel the state to obtain J's information from Google: "The [c]ourt now does not believe it can force the district attorney to apply for a search warrant or to move for an order." And finally, the court denied defendant's motion to compel J to comply with a subpoena *duces tecum* requiring her to bring her laptop or a clone to her trial. Defendant was subsequently tried to the court and convicted, as noted above, of two counts of first-degree rape, two counts of first-degree sodomy, and one count each of strangulation and fourth-degree assault. He was sentenced to 300 months in prison and a fine of $112,103.34.

## II. PROSECUTORIAL MISCONDUCT ALLEGATION

Although defendant raises four assignments of error on appeal, some confusion results because the trial court appeared to combine two adverse rulings in a single denial of a motion to dismiss. For the sake of clarity and convenience, we parse defendant's assignments somewhat differently. In essence, he focuses on three issues: the court's denial of his motion to dismiss based on prosecutorial misconduct; the court's refusal to compel the prosecution to obtain J's internet information from Google; and the court's denial of his motion to compel J to submit her computer to the court for an *in camera* inspection to determine whether it contained relevant evidence. We begin with the allegation of prosecutorial misconduct argument.

Defendant contends that the state, acting in bad faith, repeatedly and intentionally refused to comply with a court order and that, as a result, defendant had to go to trial without exculpatory evidence. The procedural delays related above support, at the least, what the state conceded at trial was "resistance" to the court order and what the state now concedes on appeal was "steadfast refusal." We find that these terms are too mild. To recapitulate briefly:

After receiving a court order to obtain J's Google data within 10 days—data that the court ruled, without objection, was exculpatory—the state did nothing to comply. Over a month later, without notifying the court in the

interim, the state moved for reconsideration and, when that motion was denied, explained to the court that no effort to obtain the data had been undertaken because doing so required J's IP address, and that discovering that address would be impractical and expensive, although not impossible. At the time, the prosecution in fact already had J's IP address.

After the court once again ordered the state to obtain the data, the state once again did nothing before another hearing two weeks later. At that hearing, a prosecution "expert" explained that he had learned, through double hearsay that he never attempted to confirm, that Google kept data for a maximum of 28 days, so J's data from February 2011 would not be available. A quick look at Google's website during a break at the hearing revealed that Google kept data for at least nine months. The court warned the state that "you may be putting this entire case in jeopardy by the way you're handling this."

After learning that Google would disclose J's data only in response to a warrant, the state did nothing for five weeks, then informed the court that a warrant could not lawfully be obtained because no law authorized issuing a warrant for exculpatory evidence. The judge subsequently ruled, again without objection, that a warrant could lawfully issue pursuant to ORS 133.535(1) for information "concerning the commission of a criminal offense."

On appeal, the state maintains that "it did cooperate to some extent in an attempt either to resolve the dispute or to narrow the issues for possible appellate review." That cooperation consisted of (1) asking J if she would consent to Google releasing the information (she refused); (2) sending Google a subpoena for the information (three months after being ordered to do so; Google required a warrant); and (3) sending Google a letter requesting preservation of the data (Google never responded and the state never followed up).

In denying the defense motion for dismissal based on prosecutorial misconduct, the trial court acknowledged that the state showed a "lack of good faith," as well as "foot-dragging and delay and resistance" to the court's order

to obtain "important and exculpatory" evidence. Overriding that concern, however, the court emphasized that, although the evidence was important and exculpatory, it was not the "heart of the case," and denying defendant access to it "is not the sort of thing that would * * * justify the [c]ourt in dismissing the case."

We find the state's conduct at trial to be seriously disturbing. Its "lack of good faith" with respect to obtaining the Google information was significantly worse than foot-dragging, delay, and resistance. It was repeated, intentional, and conceded defiance of a court order. Such defiance is nothing short of an attack on the judicial system itself. A sincere, strong, and (as it turned out) correct belief that a court order is erroneous[7] does not give the person to whom it is directed license to disobey it. However, there is a significant difference between prosecutorial misconduct—even sanctionable prosecutorial misconduct[8]—and misconduct that justifies dismissing a case. For that reason, as explained below, we conclude that the trial court did not err in denying defendant's motion to dismiss.

The leading cases on prosecutorial misconduct involve motions for mistrial, not, as in this case, motions to dismiss. Under the mistrial cases, we review a trial court's decision for abuse of discretion. *State v. Smith*, 310 Or 1, 24, 791 P2d 836 (1990); *see State v. Serrano*, 355 Or 172, 197, 324 P3d 1274 (2014), *cert den*, ___ US ___, 135 S Ct 2861 (2015). Where the decision does not stem from a "mistaken legal premise," *State v. Romero (A138124)*, 236 Or App 640, 643-44, 237 P3d 894 (2010), or a fact issue, neither of which is alleged to have occurred here, a court abuses its discretion only when the alleged misconduct denies the defendant a fair trial. *State v. Washington*, 355 Or 612, 659-60, 330 P3d 596, *cert den*, ___ US ___, 135 S Ct 685 (2014). We have found no authority for the proposition that a different standard of review or definition of "abuse of discretion" applies in cases involving a pretrial motion to dismiss, nor can we conceive of a reason why such a difference should exist. In

---

[7] *See* 281 Or App at 595-607.

[8] We express no opinion as to whether the prosecutors' conduct in this case violated any disciplinary rules or amounted to a contempt of court.

any event, even if the generic standard of review for motions to dismiss—legal error, *State v. Garner*, 234 Or App 486, 491, 228 P3d 710, *rev den*, 348 Or 621 (2010)—were to apply, our conclusion would be the same.

Here, the alleged misconduct was the prosecution's defiance of the court's order to obtain J's internet information from Google. The court ruled, in effect, that this defiance did not deny defendant a fair trial. We agree. The court ultimately ruled that it had no authority to issue the order that the state defied. Thus, although the state's misconduct was egregious, it had, in the final analysis, no impact on the ultimate fairness of defendant's trial. The court neither abused its discretion nor legally erred in denying defendant's motion to dismiss based on prosecutorial misconduct.

## III. DENIAL OF MOTION TO COMPEL THE STATE TO OBTAIN AND DISCLOSE INFORMATION IN THE POSSESSION OF GOOGLE

We turn, then, to defendant's argument that the court erred when, in a reversal of its earlier ruling, it denied defendant's motion to compel the state to obtain J's internet information, which the court itself ruled was "important and exculpatory." According to defendant, Oregon statutes, as well as the state and federal constitutions, entitle him to that court order. The state responds that the court correctly concluded that the order would exceed the court's statutory and constitutional authority. As indicated above and explained below, we agree with the state.

### A. *Defendant's Statutory Claim*

We begin with defendant's statutory argument, because "[c]onstitutional interpretation is required only if a law does not otherwise provide for disclosure of information to which the defense must have access." *State v. Warren*, 304 Or 428, 431, 746 P2d 711 (1987). The relevant statute is ORS 135.815(1):

> "Except as otherwise provided in ORS 135.855 and 135.873,[9] the district attorney shall disclose to a represented

[9] Neither ORS 135.855 nor ORS 135.873 is relevant to this aspect of defendant's argument.

defendant the following material and information within the possession or control of the district attorney:

"* * * * *

"(g) Any material or information that tends to:

"(A) Exculpate the defendant;

"(B) Negate or mitigate the defendant's guilt or punishment; or

"(C) Impeach a person the district attorney intends to call as a witness at the trial."

Two unchallenged facts frame this statutory issue. First, the court ruled that Google's information about J's internet activity was "exculpatory and material," and the state neither objected to that ruling at trial nor challenges it on appeal. *See* 281 Or App at 588 & n 3. Second, the information was not "within the possession" of the district attorney. Thus, the dispositive question is whether the information was within the district attorney's "control" as that term is used in ORS 135.815.

As we held in *State v. Wixom*, 275 Or App 824, 831-32, 366 P3d 353 (2015),

> "[t]he legal standard for prosecutorial control of records is not disputed. As we have recently explained, 'if an entity is *required* to disclose records to the district attorney or to police, the prosecution has control over the records and, accordingly, must disclose to a defendant any of those records that fall within ORS 135.815.' *State v. Daniels*, 261 Or App 519, 528, 323 P3d 491, *rev den*, 355 Or 668 (2014) (emphasis in original). And, 'information that the prosecutor may obtain directly is within the prosecutor's "control" * * * even if it was not in the prosecutor's physical possession.' *State v. Warren*, 304 Or 428, 433, 746 P2d 711 (1987); *accord State ex rel Wilson v. Thomas*, 74 Or App 137, 141, 700 P2d 1045, *rev den*, 300 Or 64 (1985) ('[T]he police are an arm of the prosecution for the purposes of the discovery statute.')."

(Omission in original.)

Thus, for purposes of ORS 135.815, the prosecution controls Google information only if (1) Google is "required" by the ECPA to divulge J's information to the state, or

(2) the prosecution can obtain the information "directly." Under the plain language of the ECPA, Google is not required to disclose the information to the prosecution; rather, it "may" do so. 18 USC § 2702(a), (b); *see In re Facebook, Inc.*, 923 F Supp 2d 1204, 1206 (ND Cal 2012) (under plain language of 18 USC § 2702(b), disclosure pursuant to exception is discretionary). *But see Negro v. Superior Court*, 230 Cal App 4th 879, 904, 179 Cal Rptr 3d 215, 234 (2014), *rev den* (Jan 28, 2015) (Google is required to comply with subpoena to disclose content of user's emails after the user consents to disclosure). The question, then, becomes whether "the prosecutor may obtain [the information] directly." *Wixom*, 275 Or App at 839.

No cases have expressly defined what the phrase "obtain directly" means, but in context, the meaning of "directly" is unambiguous: "without any intervening agency or instrumentality * * * : without any intermediate step." *Webster's Third New Int'l Dictionary* 641 (unabridged ed 2002). We have held that material in the possession of the Department of Corrections is not in the control of (and therefore, by necessary implication, not directly obtainable by) the prosecution, *State v. Daniels*, 261 Or App 519, 527-28, 323 P3d 491, *rev den*, 355 Or 668 (2014), nor is material in the possession of the Department of Human Services, *Wixom*, 275 Or App at 837.[10] In both of those situations, the prosecutor would have to obtain the information through an intervening, intermediate agency. We have found only one example of material within prosecutorial "control" even though it was not within immediate prosecutorial possession or required by statute to be disclosed to the prosecution: material in the possession of the police, because "police are an arm of the prosecution for the purposes of the discovery statute." *Wilson*, 74 Or App at 141. Even that exception does not apply to information in the possession of police in a jurisdiction that is different from the prosecution's. *State ex rel Glode v. Branford*, 149 Or App 562, 568-69, 945 P2d 1058

[10] In *Warren*, 304 Or at 431-33, the Supreme Court held that the discovery statutes *required* that files in the possession of the Children's Services Division had to be disclosed to the defendant in a sex abuse case, not that the information was directly obtainable by the prosecution. *See Daniels*, 261 Or App at 526-28 (explaining *Warren*).

(1997), *rev den*, 326 Or 389 (1998) (Lincoln County prosecutor not in "control" of material in possession of police departments in other counties).

If the prosecutor cannot "directly obtain" information held by a state agency and relevant to a criminal prosecution, *Daniels*, 261 Or App at 527-28, it follows *a fortiori* that the prosecution in the present case cannot "directly obtain" information from Google, a nonparty. *See also State ex rel Beach v. Norblad*, 308 Or 429, 432, 781 P2d 349 (1989) (trial court judge lacks authority to compel nonparty in criminal case to allow defendant access to nonparty's house). Because that information is neither in the possession of the prosecution nor obtainable by it without the cooperation of an intermediate entity, defendant is not entitled to it under the discovery statutes.

B. *Defendant's Constitutional Claim*

If defendant has a constitutional entitlement to the Google information, the failure of his statutory claim is irrelevant. The two claims are "not necessarily synonymous." *State v. Koennecke*, 274 Or 169, 176, 545 P2d 127 (1976). As we understand defendant's constitutional arguments, he does not challenge the facial constitutionality of the ECPA provision prohibiting Google from disclosing J's information to him. Rather, he challenges the trial court's denial of his motion to compel the prosecution in this case to obtain and disclose that information, relying on the prosecution's obligation under *Brady v. Maryland*, 373 US 83, 87, 83 S Ct 1194, 10 L Ed 2d 215 (1963), to share information in its possession or control, and on *Wardius v. Oregon*, 412 US 470, 475-76, 93 S Ct 2208, 37 L Ed 2d 82 (1973), in which the Supreme Court held that the Due Process Clause prohibited enforcement of a statute that created imbalance between the prosecution's and the defendant's discovery rights. These are both "as applied" challenges.

Although we generally examine state constitutional claims before federal ones, *Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981), in this case doing so has no practical effect. Although the parties appear to rely on the compulsory process clauses of the Sixth Amendment to the United States Constitution and Article I, section 11, of the Oregon

Constitution, the only relevant constitutional provision is the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The United States Supreme Court so decided in *Pennsylvania v. Ritchie*, 480 US 39, 56, 107 S Ct 898, 94 L Ed 2d 40 (1987), and we concurred in *State v. Zinsli*, 156 Or App 245, 252, 966 P2d 1200, *rev den*, 328 Or 194 (1998) (compulsory process review "is absorbed into the due process analysis" of the Fourteenth Amendment). In any event, even if the state and federal compulsory process clauses were independently relevant, "[t]he right to compulsory process under Article I, section 11, parallels Sixth Amendment jurisprudence, *State v. Mai*, 294 Or 269, 272, 656 P2d 315 (1982), and the analysis of the two constitutional provisions is the same." *Wixom*, 275 Or App at 839.

1. Brady v. Maryland

The due process right to prosecutorial disclosure of material, exculpatory evidence stems from *Brady*, 373 US at 87, where the Court held that the prosecution's failure to disclose "evidence favorable to an accused * * * violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Evidence is "favorable to the accused" if it is either directly exculpatory or could be used to impeach a government witness. *United States v Bagley,* 473 US 667, 676-77, 105 S Ct 3375, 87 L Ed 2d 481 (1985). "Materiality" includes not only relevance; it also encompasses a requirement that the state's failure to disclose the evidence be prejudicial. *Kyles v. Whitley*, 514 US 419, 434, 115 S Ct 1555, 131 L Ed 2d 490 (1995).

There can be no argument about whether the undisclosed evidence was exculpatory, despite the fact that the court deemed it to be so without having seen it. As noted, 281 Or App at 588 n 3, the state did not object to the court's conclusion at trial. Nor can we review the unpreserved claim of error as "apparent on the record," ORAP 5.45(1), because the state has not challenged the conclusion nor, in any other fashion, requested plain error (or any other) review.

The question of materiality is more difficult, for two reasons. First, the well-settled standard for "materiality" is imprecise and subjective.

> "Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal[.] * * * [The] touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"

*Kyles*, 514 US at 434 (quoting *Bagley*, 473 US at 678). The dispositive question, thus, is whether there was a "reasonable probability" that the undisclosed evidence would have resulted in an acquittal or, put slightly differently, whether in the absence of the undisclosed evidence the court nonetheless reached a verdict worthy of confidence. *Id.*; *accord Ritchie*, 480 US at 57. Answering these questions always involves *post hoc* speculation and a potentially overwhelming number of variables that will differ from case to case. Second, the degree of speculation is compounded enormously where, as here, neither the trial court nor we know what the undisclosed evidence is. Nonetheless, we are inclined to conclude that, although there is a *possibility* that the Google information could have resulted in an acquittal, that possibility was a far cry from a *reasonable probability*. In light of the inculpatory evidence and the trial court's finding that J was a credible witness, we are inclined to find the verdict worthy of confidence.

However, we need not rely on that inclination, because defendant's *Brady* argument fails for a more fundamental reason: After an exhaustive search, we have found no authority for the proposition that the prosecution's *Brady* obligation to disclose material exculpatory evidence extends to evidence in the hands of a private entity such as Google. In fact, we have found significant, albeit indirect, authority for the proposition that the obligation does not extend that far.

Where Oregon cases involving discovery statutes refer to the prosecution's obligation to disclose evidence in its "possession or control," that phrase appears nowhere in *Brady* itself nor in Oregon, federal, or other state cases discussing it. Rather, the operative phrase is "actual or constructive possession." *See, e.g.*, *United States v. Gray*, 648 F3d 562, 564 (7th Cir 2011), *cert den*, 565 US 1133, 132 S Ct 1056 (2012); *United States v. Brown*, 510 F3d 57, 71 (1st Cir 2007); *United States v. Risha*, 445 F3d 298, 303 (3d Cir 2006); *United States v. Joseph*, 996 F2d 36, 39 (3d Cir), *cert den*, 510 US 937 (1993). United States Supreme Court cases indicate that actual possession refers to material in the possession of the prosecution itself, while constructive possession extends to material that is in the possession of "others acting on the government's behalf, *** including the police." *Kyles*, 514 US at 437. The lower federal courts that have considered the issue are uniformly more explicit. For example, in *United States v. Reyeros*, 537 F3d 270, 284 (3d Cir 2008), *cert den*, 556 US 1283 (2009), the court held that United States prosecutors had no *Brady* obligation to disclose material held by Colombian government authorities, despite the fact that the prosecution team had access to the documents:

> "The mere fact that documents may be obtainable is insufficient to establish constructive possession. Without a showing that evidence is possessed by people engaged in the investigation or prosecution of the case, we have declined to hold that the evidence was constructively possessed by federal prosecutors, despite its being in the possession of another agent of the federal government and therefore presumably obtainable."

*Accord United States v. Pelullo*, 399 F3d 197, 218 (3d Cir 2005), *as amended* (Mar 8, 2005), *cert den*, 546 US 1137 (2006) ("[T]he prosecution is only obligated to disclose information known to others acting on the government's behalf in a particular case[.]"); *United States v. Perdomo*, 929 F2d 967, 971 (3d Cir 1991) ("[C]ases indicate that the availability of information is not measured in terms of whether the information is easy or difficult to obtain but by whether the information in the possession of some arm of the state."); *United States v. Auten*, 632 F2d 478, 481 (5th Cir Unit A

1980) (focus for purposes of obligation to disclose is on the "prosecution team").

There is language in some cases that, taken out of context, could be interpreted to suggest a broader scope of the prosecution's *Brady* obligation, in particular, a general obligation to disclose material that it knows about or has access to. For example, in *Calley v. Callaway*, 519 F2d 184, 223-24 (5th Cir 1975), *cert den sub nom Calley v. Hoffmann*, 425 US 911 (1976), the court stated,

> "The basic import of *Brady* is * * * that there is an obligation on the part of the prosecution to produce certain evidence actually or constructively in its possession or accessible to it in the interests of inherent fairness. * * *
>
> "* * * The leading articles on enhanced criminal discovery emphasize what we stress here, that *Brady* and other means of criminal discovery indicate the need for disclosure of important information known or available to the prosecutor in order to promote the fair administration of justice."

(Footnote omitted.)

The evidence at issue in *Calley*, however—"[a]ll witness testimony and documentary evidence in the custody and control of the House of Representatives of the United States," *id.* at 220—was in the possession of a congressional investigating committee. Further, the court ruled that the information was *not* within the ambit of *Brady*. *Id.* The reference to "accessible" information and information "known or available to the prosecutor" was *dictum* and, in context, referred to material held by the government itself. Likewise, in *Auten*, 632 F2d at 481, the court cited *Calley* and concluded that, by failing to disclose the criminal record of a witness, the prosecution failed to meet its *Brady* obligation: "We conclude that the government did have knowledge, for purposes of the disclosure requirements, of the criminal record." Again, however, the disputed material itself was in the possession of the government, and, in any event, the court approvingly quoted an earlier decision in "declin[ing] 'to draw a distinction between different agencies under the same government, focusing instead upon the "prosecution team" which includes both investigative and prosecutorial

personnel.'" *Id.* (quoting *United States v. Antone*, 603 F2d 566, 569 (5th Cir 1979)). The issue before the courts seems to have been how far *into the government itself Brady* reaches. We have found no authority for the proposition that *Brady* requires the prosecution to seek out or disclose evidence in the possession of private persons or institutions, such as Google in the present case, that cannot be considered part of the prosecutorial "team." Because the Google information is in neither the actual nor the constructive possession of the prosecution, *Brady* does not require the state to obtain and share it.

2. Wardius v. Oregon

In 1971, *former* ORS 135.875(1), *renumbered as* ORS 135.455, required the defendant in a criminal prosecution who intended to rely on an alibi to provide the prosecution with notice of

> "the place or places where the defendant claims to have been at the time or times of the alleged offense together with the name and residence or business address of each witness upon whom the defendant intends to rely for alibi evidence. If the defendant fails to file and serve such notice, he shall not be permitted to introduce alibi evidence at the trial of the cause unless the court for good cause orders otherwise."

No law, however, required the *prosecution* to inform the *defense* of the witnesses it intended to call to rebut the alibi. In *State v. Wardius*, 6 Or App 391, 392-93, 487 P2d 1380, *rev den* (1971), *rev'd*, 412 US 470, 93 S Ct 2208, 37 L Ed 2d 82 (1973), the defendant failed to provide the then-required notice, and the trial court consequently struck the alibi evidence. The defendant was convicted. On appeal, he challenged the constitutionality of the notice-of-alibi statute. This court affirmed, *id.* at 394-99, and the Oregon Supreme Court denied review. The United States Supreme Court granted *certiorari* and reversed:

> "We hold that the Due Process Clause of the Fourteenth Amendment forbids enforcement of alibi rules unless reciprocal discovery rights are given to criminal defendants. Since the Oregon statute did not provide for reciprocal discovery, it was error for the court below to enforce it against petitioner[.]

> "* * * * *
>
> "We do not suggest that the Due Process Clause of its own force requires Oregon to adopt [reciprocal discovery] provisions. But we do hold that in the absence of a strong showing of state interests to the contrary, discovery must be a two-way street. The State may not insist that trials be run as a 'search for truth' so far as defense witnesses are concerned, while maintaining a 'poker game' secrecy for its own witnesses. It is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State."

*Wardius v. Oregon*, 412 US 470, 472, 475-76, 93 S Ct 2208, 37 L Ed 2d 82 (1973) (citations and footnote omitted).

Defendant contends that, because the ECPA allows Google to release J's search history to the prosecution because it is a "law enforcement agency," 18 USC § 2702(b)(7)(A)(ii), the trial court had a constitutional obligation to ensure "reciprocal discovery rights" to defendant by ordering the prosecution to obtain the data and share it with defendant. As explained below, we disagree.

The holding in *Wardius* is narrow. It forbids *enforcement* of non-reciprocal *discovery rules* that *penalize* a defendant, but not the prosecution, for failing to *disclose* information to the prosecution. *Wardius*, 412 US at 472-76. The United States Supreme Court has never significantly referred to *Wardius*, much less explained or expanded it. Yet defendant urges us to expand *Wardius* by applying it despite the fact that this case differs from that one in essential ways. This case deals with a statute, the ECPA, that has only an attenuated, oblique, and hypothetical relation to discovery, and appears to deal more directly with criminal investigation. The statute does not deal with mandatory disclosure imposed on a defendant but not on the prosecution. Further, because the prosecution never availed itself of its potential opportunity to acquire J's Google information, it did not "subject" defendant to the "hazard of surprise" regarding "the very * * * evidence" that defendant sought. *Id.* at 476. Here, there was reciprocity and even-handedness in the sense that neither the defense nor the prosecution

accessed J's Google information. We have found no support in case law or logic for broadening the scope of *Wardius* as defendant requests.

The Oregon Supreme Court has discussed *Wardius* in only two cases. Neither presented the court with the occasion to decide whether *Wardius* applied outside of the context of trial-related statutes conferring advantages on the prosecution; rather, in both, the court avoided the defendants' constitutional claims by holding that the challenged statutes did not, in fact, provide the prosecution with any advantage. In *State v. Upton*, 339 Or 673, 125 P3d 713 (2005), the defendant challenged ORS 136.770(3), a recently enacted statute under which enhancement facts had to be submitted to the jury. The defendant contended that the statute violated the Due Process Clause as construed in *Wardius* because it "creates a procedure under which a jury determines aggravating or enhancing factors, but does not do the same for mitigating factors." *Id.* at 686. The court rejected that argument:

> "*Wardius* * * * does not require that every procedure relating to both a defendant and the state ensure identical rights in order to satisfy due process. Rather, *Wardius* addressed only a narrow procedural requirement that is not at issue here. * * * The holding in *Wardius*, however, did not establish a constitutional rule that a defendant and the state must be treated identically in all respects.
>
> "In our view, permitting the submission of aggravating or enhancing facts for jury determination does not provide any advantage to the state."

*Id.* at 686-87.

In *State v. Moore/Coen*, 349 Or 371, 389-91, 245 P3d 101 (2010), *cert den*, 563 US 996 (2011), the defendant challenged provisions of the Oregon Evidence Code that, he alleged, amounted to a one-sided rule benefiting only the prosecution by limiting the ability of criminal defendants to invoke a balancing test in order to determine whether evidence of prior crimes or wrongs was admissible. As it did in *Upton*, the court rejected the defendant's challenge, holding that the statutory scheme did not "prevent a defendant from presenting a complete defense." *Id.* at 391. The court

also quoted the passage from *Upton*, above, emphasizing the narrow scope of *Wardius*.

Thus, although Oregon cases do not directly address the scope of *Wardius*, they indicate that the case should not be expansively applied. We have exhaustively searched cases from other jurisdictions, and we find none that would permit expansion to the degree that defendant advocates. Defendant cites only one case assertedly in support of his position, *United States v. Bahamonde*, 445 F3d 1225 (9th Cir 2006). *Bahamonde* is, indeed, one of the very rare cases in which a *Wardius* challenge succeeded. However, it is unhelpful to defendant for two reasons. First, it adjudicated a challenge to a Department of Homeland Security regulation *requiring* a private party seeking "'official information'" to "'set forth in writing, and with as much specificity as possible, the nature and relevance of the official information sought,'" without imposing any "requirement that the government specify the nature of testimony or other evidence that it intends to use to rebut the demanded testimony." *Id.* at 1228-29 (quoting 6 CFR § 5.45). Thus, as in *Wardius* but not this case, the defendant was "required to state with specificity the testimony he expected from [a witness] but the government was not required at any time to state what evidence it expected to offer in rebuttal." *Id.* at 1229. Second, the statute was actually enforced against the defendant, to his prejudice. *Id.* at 1230 ("The regulation, as applied in this case, accordingly falls squarely within the rule of *Wardius*. We cannot say, on this record, that this constitutional error was harmless beyond a reasonable doubt." (Footnote omitted.)); *see also United States v. Jordan*, 964 F2d 944, 948 (9th Cir), *cert den*, 506 US 979 (1992) ("Because this is not a case where the government has introduced evidence at sentencing and the defendant is precluded from obtaining or introducing evidence to refute it, *Wardius* is not controlling.").

In sum, we find no authority to expand *Wardius* as defendant urges, nor has defendant presented us with any argument explaining why such an expansion is appropriate. We therefore reject his argument. Based on that rejection, along with our rejection of his statutory and *Brady* arguments, we conclude that the trial court did not err in denying

defendant's motion to compel the prosecution to obtain and share J's Google information.

## IV. DENIAL OF DEFENDANT'S MOTION TO COMPEL J TO COMPLY WITH SUBPOENA *DUCES TECUM*

Defendant served J with a subpoena *duces tecum* requiring her to bring with her to court:

> "1. The computer or its cloned hard drive copy that you used on February 26, 2011 to perform an internet search;
>
> "2. Any and all writings, journal entries, or diary entries that you have created regarding [defendant] or the allegations associated with this case from 2/22/11 until the present date; and,
>
> "3. Any external storage devices containing data from items 1 & 2."

When she did not bring any of the requested items, defendant filed a motion to compel compliance. In an accompanying memorandum and in oral argument before the court, he explained that the computer could reveal whether J had, as she testified, erased its contents. If not, he argued, that would undermine her credibility and also reveal potentially exculpatory evidence; if so, that fact would itself be relevant evidence that she had something to hide. In the memorandum, he "request[ed] an order permitting the defense to conduct a forensic examination * * * conducted pursuant to a protective order that limits the scope of the examination to the targeted material and prohibits the use of any discovered evidence beyond the purposes of this litigation." At oral argument before the trial court, defendant explained his proposed procedure:

> "Now, I'm not proposing, of course, under this protective order that whatever the—the forensic expert determines he simply hands over to the defense. It has to go to the [c]ourt *in camera* as is the case with any other potentially sensitive or inadmissible kind of material for the [c]ourt to make a determination of whether such information exists and if the defendant is going to be able to have it[.]"

On appeal, he characterizes this proposal as follows: "[D]efendant proposed the court utilize an expert who

would: (1) work subject to the protective order; (2) conduct a targeted search for exculpatory materials; and (3) reveal its results to the court alone."

Although these statements are not perfectly clear with respect to the roles of the forensic expert and the court, we presume, based on the overall context of the parties' arguments, that they understood defendant's proposal to be that the forensic expert would access the digital contents of the computer and turn over to the court in readable format all of the material entered during the specified time frame, including successful and unsuccessful attempts to delete material. The court would then determine which entries met the criteria specified in the subpoena ("[a]ny and all writings, journal entries, or diary entries that you have created regarding [defendant] or the allegations associated with this case from 2/22/11 until [June 21, 2012]") and provide them to defendant. The defendant could then attempt to use introduce the material at trial, subject, of course, to objection by the state and the ruling of the court. Defendant maintains that this procedure would be analogous to one in which written materials in a language that the court did not understand would be translated by an interpreter and presented to the court.

The state responded at trial and on appeal that such a procedure would violate J's right to freedom from unreasonable searches and seizures as guaranteed by Article I, section 9, of the Oregon Constitution and the Fourth Amendment.

Each side's position has some force. Defendant does not, and could not, deny that J has a privacy interest in the contents of her computer. *See United States v. Andrus*, 483 F3d 711, 718 (10th Cir 2007), *reh'g den*, 499 F3d 1162, *cert den*, 552 US 1279 (2008) ("A personal computer is often a repository for private information the computer's owner does not intend to share with others."); *see also Riley v. California*, ___ US ___, 134 S Ct 2473, 2489, 189 L Ed 2d 430 (2014) ("[t]he sum of an individual's private life can be reconstructed" from cell phone data). Rather, he argues only that her interest cannot supersede his statutory and constitutional right to subpoena evidence. The state, for its

part, does not deny that Oregon statutory as well as state and federal constitutional law confer on criminal defendants the right to subpoena witnesses and relevant evidence in their possession. *See* US Const, Amend VI; Or Const, Art I, § 11; ORS 136.567(1); ORS 136.583. Rather, it argues only that these rights are circumscribed by a witness's right to privacy.[11]

The court accepted the state's argument and denied defendant's motion.

After the verdict, defendant sought an order requiring J to provide the court with a sealed clone of her hard drive so that it would be available if defendant's appeal were to succeed. The court granted defendant's motion, and the state once again took an interlocutory appeal. The Supreme Court affirmed, ruling that J had to turn over the clone. *State v. Bray*, 352 Or 809, 811, 291 P3d 727 (2012) (*Bray II*). She subsequently did so.

We once again begin with an examination of the relevant statutes. ORS 136.567(1) provides that "[a] defendant in a criminal action is entitled * * * to have subpoenas issued." ORS 136.575 provides a template for a subpoena directed to an individual, and ORS 136.580 adds,

> "(1) If books, papers or documents are required, a direction to the following effect shall be added to the form provided in ORS 136.575: 'And you are required, also, to bring with you the following: (describing intelligibly the books, papers or documents required).'
>
> "(2) Upon the motion of the state or the defendant, the court may direct that the books, papers or documents described in the subpoena be produced before the court prior to the trial or prior to the time when the books, papers or documents are to be offered in evidence and may, upon production, permit the books, papers or documents to be inspected and copied by the state or the defendant and the state's or the defendant's attorneys."

In *State v. Cartwright*, 336 Or 408, 417, 85 P3d 305 (2004), the court explained that ORS 136.580(1) provides

[11] The state conceded at trial that the CVBR deals with a victim's rights with respect to a defendant's discovery, not with respect to subpoenas.

the proper form for an "ordinary" subpoena *duces tecum*—one requiring a witness to bring evidence "*to the defendant's trial or to a trial-related court proceeding at which the material may be called for as evidence*"—while ORS 136.580(2) provides a specific mechanism for obtaining "early access" to the subpoenaed material "*before* the court proceeding at which the material will or may be admitted as evidence." (Emphases in *Cartwright*.) Defendant's subpoena in this case required J to "appear before the circuit court" on the date and time of the trial "to give evidence in the above-entitled matter on behalf of the defendant," and required her also to bring with her "the computer or its cloned hard drive." The subpoena, therefore, was what the court in *Cartwright* called an ordinary subpoena *duces tecum*.

The distinction is important. The court explained that "the standards that apply to motions for early production under ORS 136.580(2) were not relevant" to an ordinary subpoena *duces tecum*. *Id.* Those standards give the trial court discretion to compel, or not compel, the production of evidence: "[T]he trial court's decision to deny or accede to a request for such early production under ORS 136.580(2) is within the court's discretion," because that subsection states that "'the court *may* direct'" early production. *Id.* at 416-17 (quoting ORS.580(2) (emphasis in *Cartwright*)). Because the subpoena in this case is an "ordinary" one,

> "whatever the scope of a court's authority in such circumstances, such authority cannot permit trial courts to violate a criminal defendant's broad right under the subpoena statutes to compel witnesses to attend his or her trial (and to bring along any 'books, papers or documents' that the defendant has identified in the subpoena)."

*Id.* at 417.[12]

Despite defendant's compliance with the relevant subpoena statutes, the court prohibited him from exercising

[12] *Cartwright* also draws a distinction between an early-access subpoena and a request for discovery, noting that an early-access subpoena "is not and cannot amount to an attempt to obtain discovery." *Id.* at 418. The distinction is that the subpoena "does not require production of the material to the party issuing the subpoena; it merely commands that the witness bring the material to the courtroom so that it is available if and when a party needs it." *Id.* By that criterion the document at issue here is clearly not a request for discovery.

his "broad right" to compel J to bring with her to trial the "books, papers or documents identified in the subpoena." *Id.* As explained below, we conclude that, in doing so, the court did not use the appropriate analytical method.

It is true that the subpoena required J to bring to court a computer or a clone of its hard drive, as well as peripheral devices, not "books, papers or documents." It is also true that, hyper-literally, he did not subpoena the contents of those items but the objects themselves. However, it was clear to all concerned that the object of the search was not the hardware, but some of the data that it contained. And, as the Supreme Court held in *Cartwright* about another item that was subpoenaed for its digital contents,

> "[a]lthough audiotapes are not precisely 'books, papers or documents,' no party questions the proposition that audiotapes are or may be so analogous to those subjects that it would be illogical to refuse to apply the statute's terms to audiotapes. We agree with that common premise. The audiotapes at issue here are the functional equivalent of written statements. It would be a towering triumph of form over substance to hold that [the subpoenaed party's] choice of an electronic, rather than a documentary, mode of preserving the witness' statements puts the statements beyond the reach of a subpoena *duces tecum*."

*Id.* at 414 n 4. Likewise, it would be "a towering triumph of form over substance" to hold that in seeking the hardware defendant was not seeking its contents, or that the digital contents of a computer are not sufficiently analogous to books, papers, or documents so as to fall within ORS 136.580.

It is also true that a criminal defendant's right under Oregon's subpoena statutes is not unlimited. In *State v. Jackson*, 223 Or App 429, 433-34, 196 P3d 559 (2008), the trial court denied the defendant's motion to compel witnesses to produce their handwriting exemplars. On appeal, this court reversed, and, in the process, discussed the scope of the witnesses' obligation to comply with a properly issued subpoena.

> "A criminal defendant has the right to subpoena witnesses. *See* ORS 136.567. A person who has been subpoenaed has

> an obligation to appear as a witness and give evidence. The scope of evidence that a witness can be compelled to give is defined in terms of the general duty to testify and privileges, which are exceptions to the duty, rather than specific grants of authority to courts to compel a witness to give evidence, as the state contends. *See United States v. Euge*, 444 US 707, 712, 100 S Ct 874, 63 L Ed 2d 141 (1980) ('The scope of the "testimonial" or evidentiary duty imposed by common law or statute has traditionally been interpreted as an expansive duty limited principally by relevance and privilege.' (Footnote omitted.)). A court's authority rests in its obligation to enforce the duty to give evidence unless a testimonial privilege applies."

*Id.*

Under Oregon case law, then, there are at least two limitations on a witness's "expansive duty" to accommodate a criminal defendant's "broad right" to compel production of evidence, *Cartwright*, 336 Or at 417: relevance and privilege. The state, as noted, proposes another limitation: a witness's constitutional right to privacy. In essence, the state maintains that J has a constitutional right to withhold material that might contain relevant, exculpatory, unprivileged evidence on the ground that the she has a privacy interest in that material.

Nothing in Oregon law supports the state's position, and we reject it. The implications of such a position are far-reaching. Imagine, for example, a criminal defendant charged with committing a burglary. He knows that the interior of the victim's home is protected by video surveillance cameras. To prove that another person, not the defendant, committed the burglary, the defendant subpoenas the videotape, specifying that it would be processed by a technician under a protective order and presented to the court for an *in camera* inspection. The state's argument would permit the witness to defy the subpoena by claiming that Article I, section 9, gives him a privacy right in the interior of his home. That argument is unprecedented and untenable.

The United States Supreme Court has likewise held that "[i]t is the manifest duty of the courts to vindicate [the Sixth Amendment Confrontation Clause], and to accomplish

that it is essential that all relevant and admissible evidence be produced," including "documents," even where the possessor lodges a privacy-based claim of exemption. *United States v. Nixon*, 418 US 683, 711, 94 S Ct 3090, 41 L Ed 2d 1039 (1974). "We conclude," the Court wrote, "that when the ground for asserting privilege as to subpoenaed materials sought for use in a criminal trial is based only on the generalized interest in confidentiality, it cannot prevail over the fundamental demands of due process of law in the fair administration of criminal justice." *Id.* at 713; *accord Wilson v. United States*, 221 US 361, 376, 31 S Ct 538, 55 L Ed 771 (1911) ("[T]here is no unreasonable search and seizure when a writ, suitably specific and properly limited in its scope, calls for the production of documents which, as against their lawful owner to whom the writ is directed, the party procuring its issuance is entitled to have produced."); *Hale v. Henkel*, 201 US 43, 73, 26 S Ct 370, 50 L Ed 652 (1906) ("We think it quite clear that the search and seizure clause of the 4th Amendment was not intended to interfere with the power of courts to compel, through a subpoena *duces tecum*, the production, upon a trial in court, of documentary evidence."); *see also Oklahoma Press Pub. Co. v. Walling*, 327 US 186, 208, 66 S Ct 494, 90 L Ed 614 (1946) ("[T]he Fourth [Amendment] * * * at the most guards against abuse only by way of too much indefiniteness or breadth in the things required to be 'particularly described,' if also the inquiry is one the demanding agency is authorized by law to make and the materials specified are relevant.").

As the quoted material demonstrates, however, the Supreme Court has recognized Fourth Amendment limitations on a criminal defendant's compulsory process rights beyond those in Oregon case law. These limitations, of course, apply to subpoenas issued under ORS 136.580. They include the requirement that the subpoena for documents not be "unreasonable or oppressive," *Nixon*, 418 US at 698; that the subpoena name the objects to be produced with suitable specificity, *Wilson*, 221 US at 376; that the subpoena not be overbroad, *Oklahoma Press Pub. Co.*, 327 US at 208; and that the subpoena be issued pursuant to some lawful authority, *id.* As summarized by the Ninth Circuit, "[T]he use of a properly limited subpoena does not

constitute an unreasonable search and seizure under the fourth amendment. A proper subpoena is sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome." *United States v. Palmer*, 536 F2d 1278, 1282 (9th Cir 1976) (citations omitted).

If defendant had sought unlimited access to the contents of J's computer, we would readily conclude that the request was an overbroad, unreasonable, oppressive, and imprecise invasion of J's privacy. That is not how we read the subpoena, as amplified by defendant's memorandum in support of his motion to compel and by his proposed protective order. What defendant actually sought was limited to "all writings, journal entries, or diary entries that [J] created regarding [defendant] or the allegations associated with this case from 2/22/11 until [June 21, 2012]." In other words, the sequence of events that he contemplated, as noted above, 281 Or App at 607, would give him access to material only *after* the forensic expert, possibly in consultation with the parties and the court, *see* below, 281 Or App at 617, had sifted out anything outside the scope of the subpoena. The remaining information would then be subjected to an *in camera* review by the court.

That request does not run afoul of any state or federal limitations on a criminal defendant's subpoena power. The subpoena was authorized by statute. It was limited in scope to an identifiable and limited universe of information. That information was relevant; the court itself ruled that a mere list of websites visited was material, important, and exculpatory—and, to the extent that it was not or that it contained privileged material, the court would suppress it during *in camera* inspection. The trial court's rejection of defendant's motion derived from concern that material outside of the target information would not remain confidential.

> "THE COURT: *** [L]et me ask you about the protective order. Again, that doesn't really prevent access to all sorts of private information that may be there. It's simply designed to prohibit dissemination of that information by the computer—by the forensic guy, right? *** [H]e gets to see it, right?

"[DEFENSE COUNSEL]: He would—he would get to see it under the protective order.

"* * * * *

"THE COURT: I know[,] but how many restraining orders have I issued that have been violated?

"* * * * *

"* * * That's of concern to the court, and the protective order doesn't prevent the invasion of privacy, of the privacy right that [J] has. It simply ameliorates to some extent the harm from that invasion of privacy if the defense forensic examiner does not disclose what he or she has uncovered."

The trial court ruled against defendant, then, not because the court concluded that her constitutional privacy interest in the targeted information trumped defendant's statutory and constitutional subpoena power; rather, the court reasoned that a protective order issued to a defense expert would not adequately protect the confidentiality of the *non*targeted or legitimately privileged information. We share that concern, but, for three reasons, we disagree with the court's conclusion that denial of defendant's motion on that basis was the correct response.

First, we presume, in the absence of reason to believe otherwise, that the law—in this instance, the court-issued protective order—will be obeyed, *cf.* OEC 311(1)(x), in which case only the court and the expert would have access to the nontargeted or privileged information. That access would constitute at the most a minimal intrusion into J's legitimate privacy interest, an intrusion that we conclude would be justified as necessary to vindicate defendant's statutory and constitutional rights. In other words, we will not constrict defendant's right to compulsory process due to speculation that a court order will be disobeyed. Second, we find no impediment to the trial court appointing a neutral expert, under whatever supervision the court believed to be necessary and feasible, thereby addressing the court's apparent, and the state's express, suspicion of an expert chosen by the defense. Indeed, defendant himself proposed early in the proceedings that "the [c]ourt approve a court-qualified forensic expert to do a forensic search."

Third, we conclude that the trial court did not follow the standards and criteria for ruling on motions for *in camera* review of subpoenaed material that may contain privileged or otherwise confidential information intermixed with information that may be admissible.[13] Generally, in determining whether to conduct an *in camera* inspection of such material, the court should engage in a two-step process. The first step is to determine whether the party seeking the review has "produced evidence sufficient to support a reasonable belief that *in camera* review might yield" relevant unprivileged evidence. *Frease v. Glazer*, 330 Or 364, 373, 4 P3d 56 (2000). That is a legal question that we review for legal error. *State v. Lammi*, 278 Or App 690, 694, 375 P3d 547, *adh'd to as clarified on recons*, 281 Or App 96, 380 P3d 1257 (2016). In the present case, that step has already occurred. The trial court ruled that J's Google information was exculpatory and material, and, as noted above, the state neither objected to that ruling nor challenged it on appeal.

The second step, however, has not occurred. That step derives from *United States v. Zolin*, 491 US 554, 572, 109 S Ct 2619, 105 L Ed 2d 469 (1989), where the Court examined *in camera* review of material that was potentially within the attorney-client privilege but also potentially within an exception to that privilege. The Court held that, once the first step described above has occurred,

> "the decision whether to engage in *in camera* review rests in the sound discretion of the district court. The court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through the *in camera* review, together with other available evidence then before the court will establish that the * * * exception does apply."

*Id.*

---

[13] This case was tried, briefed, and argued before we clarified the appropriate procedures and criteria in *State v. Lammi*, 278 Or App 690, 375 P3d 547, *adh'd to as clarified on recons*, 281 Or App 96, 380 P3d 1257 (2016).

The Oregon Supreme Court adopted the *Zolin* analysis in *Frease*, another case involving *in camera* inspection of material that may or may not have fallen within an exception to the attorney-client privilege. 330 Or at 372 ("We conclude that *Zolin* provides an appropriate framework for determining whether a trial court may order *in camera* review of allegedly privileged materials to determine if they fall within the crime-fraud exception, and we adopt that approach * * *."). And finally, this court adopted the *Zolin*/*Frease* approach and applied it outside of the attorney-client context in *Lammi*, 281 Or App at 99 (allowing *in camera* review of counselling records to determine whether they fell within an exception to statutory confidentiality requirement):

> "[U]nder the *Zolin* framework adopted by the Supreme Court in *Frease*, once a party has made a threshold showing sufficient to permit an *in camera* review, whether to conduct that review is a separate discretionary decision for the trial court to make, in view of the types of factors identified in *Zolin*."

We can discern no reason why the same approach should not apply to material that is potentially within a privacy-protection exception to the statutory and constitutional compulsory process guarantee. Because the law regarding the use of that approach in this context was not evident at the time of trial, the court did not use it and the parties did not present the court with appropriate argument. We therefore remand. If, on remand, the court determines that no *in camera* review is justified, that decision would be subject to appellate review for abuse of discretion. *Lammi*, 281 Or App at 99. The relevant factors identified in *Zolin* include the volume of material that the trial court is being asked to review. In this case, the relevant material is the digital contents of J's computer hard drive. Depending on the amount of that material, it may be advisable for the trial court to direct the parties, in consultation with the forensic expert, to explore ways to reduce the volume (through the use of search terms or other technical tools).

If the court decides to undertake *in camera* review and, after inspection, provides defendant with information that meets the criteria specified in defendant's subpoena,

> "if defendant finds that there is material * * * that would serve as a basis for impeaching or otherwise discrediting the witnesses that appeared against him at trial, he may make that argument to the trial court. If, after hearing that argument, the trial court concludes that defendant's inability to use the materials could not have affected the verdict, then the court may make findings to support its conclusion and reinstate the original judgment of conviction. Unless the trial court can so conclude, however, it must order a new trial."

*Cartwright*, 336 Or at 421.

Vacated and remanded.