Argued and submitted July 12, affirmed September 8, 1982

# STATE OF OREGON,
*Respondent,*

*v.*

# ALBERT LAWRENCE GOLDSBY,
*Appellant.*

## (No. C81-04-32277, CA A22512)

650 P2d 952

Marilyn C. McManus, Deputy Public Defender, Salem, argued the cause for appellant. With her on the brief was Gary D. Babcock, Public Defender, Salem.

Richard David Wasserman, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Before Gillette, Presiding Judge, and Warden and Young, Judges.

WARDEN, J.

## WARDEN, J.

Defendant appeals his convictions for robbery in the first degree (two counts) and burglary in the first degree. He makes four assignments of error, contending that the trial court erred in failing (1) to suppress eyewitness identification evidence; (2) to allow a defense expert to testify regarding the validity of eyewitness identification; (3) to allow defendant to read notes taken by the clerk of the grand jury; and (4) to merge the two counts of robbery in the first degree into one for purposes of conviction.

On April 25, 1981, in the early morning hours, Dan Hall was visiting a friend's home when he heard a noise in the yard. When he went outside to investigate, two men wearing nylon stocking masks and hooded sweatshirts ordered Hall to the ground, pointed guns at his head and took his wallet. The men then "escorted" Hall inside the house and ordered Inez D'Vorshak, who was in the living room, to lie on the floor. The larger of the two men then searched her at gun point. Threatening D'Vorshak and Hall with their guns, the men searched the house. They were inside the house for approximately one hour and twenty minutes. At one time, the larger of the two men took off his mask and turned his head toward D'Vorshak for one to two minutes. At approximately 2:30 a.m., the owner of the house returned home. When the door was opened, he saw a man pointing a gun toward the doorway. The owner ran away and contacted the police. The two men then left, running in a northerly direction away from the house.

A radio description of the suspects was dispatched to police officers in the area. At 3:06 a.m., Officer Brian Duddy saw defendant running in a northerly direction three blocks from the scene of the robbery. Duddy stopped defendant, advised him that he fit the description of a robbery suspect and patted him down for weapons. Under defendant's sweatshirt, Duddy felt an empty shoulder holster. He then asked defendant to ride in the patrol car to the scene of the robbery for the purpose of eyewitness identification. Defendant said, "Okay." Hall and D'Vorshak came out, one at a time, walked up to the car and identified

defendant as the larger of the two men who had robbed them.

■ ■ In his first assignment of error, defendant contends that the eyewitness identifications should have been suppressed, because the identifications were the fruit of an illegal stop and were also unduly suggestive. On the first point, the legality of the stop of defendant by officer Duddy depends upon whether the officer had reasonable suspicion that defendant had committed a crime. ORS 131.615.[1] In determining whether the stop was justified, we examine whether the facts as perceived by the officer constituted objective cause for the stop. *State v. Armstrong,* 52 Or App 161, 166, 628 P2d 1206, *rev den* 291 Or 662 (1981). The officer knew that an armed robbery had just been committed. Defendant closely matched the radioed description and was running away from the crime scene. In addition, the stop occurred at approximately 3 a.m., when there were few people in the area. These objective facts justified stopping defendant and frisking him for weapons. ORS 131.625(1).[2] When Duddy discovered the shoulder holster, there then existed probable cause to arrest defendant, and the officer was acting within his authority when he transported defendant to the scene for identification purposes. The identification was not the fruit of an illegal stop.

■ In regard to defendant's second point, a review of the record convinces us that, even if the identification procedures were unduly suggestive, the prosecution has demonstrated that the identifications were independently reliable. *State v. Classen,* 285 Or 221, 233, 590 P2d 1198

---

[1] ORS 131.615 provides:

"(1) A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that he is a peace officer, make a reasonable inquiry.

"(2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.

"(3) The inquiry shall be considered reasonable only if limited to the immediate circumstances that aroused the officer's suspicion."

[2] ORS 131.625(1) provides:

"A peace officer may frisk a stopped person for dangerous or deadly weapons if the officer reasonably suspects that the person is armed and presently dangerous to the officer or other person present."

(1979). D'Vorshak testified at trial that she saw defendant's face for "a good minute." She gave a detailed, accurate description of defendant within minutes of the incident. She identified defendant as one of the two robbers about 20 minutes after the two had left the house, and she testified that her identification of defendant in court was based upon her "memory of the robbery." Hall testified that he got "three or four good looks" at defendant's face in a well lighted room. The detailed description given to the officers by Hall closely matched defendant's appearance. Because we conclude that any suggestiveness in the identification procedures did not affect the reliability of either the out-of-court or in-court identifications, the trial court did not err in denying defendant's motion to suppress those identifications.

■ In defendant's second assignment of error, he contends that he was entitled to have an expert witness testify regarding the factors affecting accuracy of eyewitness identification. In Oregon, it is well established that it is the province of the jury to weigh the evidence and to assign credibility. As we stated in *State v. Calia,* 15 Or App 110, 114, 514 P2d 1354, (1973), *rev den, cert den* 417 US 917 (1974),

> "* * * [although] eyewitness identification evidence has a built-in potential for error, * * * [t]he law does not deal with that potential for error by allowing expert witnesses to debate the quality of the evidence for the jury."

The expert testimony was properly excluded.

In defendant's third assignment of error, he contends that he should have been permitted to read the notes of the clerk of the grand jury of a witness' grand jury testimony after that witness had testified on direct examination at trial. Defendant relies on *State v. Hartfield,* 290 Or 583, 624 P2d 588 (1981), where the Supreme Court held:

> "[A]fter a witness has testified on direct examination by the state, the defendant is entitled to examine *an existing tape recording* of that witness's testimony given in the grand jury proceedings that led to the return of the indictment upon which trial is held." 290 Or at 592. (Emphasis supplied.)

The court's holding in *Hartfield* was limited to the discovery of an existing tape recording of grand jury testimony. The court emphasized that it did not "condone wholesale disclosure of grand jury recordings." 290 Or at 592. This court has recognized the limitation of the *Hartfield* rule. In *Addicks v. Cupp,* 54 Or App 830, 837, 636 P2d 454 (1981), *rev den* 292 Or 568 (1982), the post-conviction petitioner had sought, at his criminal trial, "all notes, minutes, recordings, testimony and transcripts" of the grand jury proceedings. This court stated, "Under *Hartfield* the motion sought more than he was entitled to receive." 54 Or App at 837. Similarly, in *State v. Christopher,* 55 Or App 544, 551, 639 P2d 642, *rev den* 293 Or 190 (1982), we stated:

> "[Hartfield] requires turnover at trial of any *existing recordings* of a witness who has testified on direct examination and who testified before the grand jury." (Emphasis added.)

In the present case, defendant seeks to extend the holding in *Hartfield* to cover the handwritten notes kept by the clerk of the grand jury pursuant to ORS 132.080. That statute provides:

> "The members of the grand jury shall appoint one of their number as clerk. The clerk shall keep minutes of their proceedings (except the votes of the individual jurors) and of the substance of the evidence given before them."

Nowhere in the statutory scheme is there an express provision indicating for what purpose the minutes are to be taken. At best, the notes contain a summary of the "substance of the evidence" as presented by grand jury witnesses. They are only memoranda of one grand juror's perceptions and impressions from the evidence. They are not the witness' words; they are the clerk's.[3] We do not believe that this is the type of evidence the court in *Hartfield* was contemplating when it held that the defendant is entitled to "mid-trial" discovery. As the court explained:

> "Where a witness before the grand jury has testified at trial for the state, a particularized need for disclosure

---

[3] A grand jury may be hypothesized that has a clerk capable of taking testimony verbatim. We think it unlikely that even such a skilled clerk, instructed to "keep minutes * * * of the substance of the evidence," would actually make notes of more than the gist of a witness' testimony.

exists for purposes of testing the witness's credibility. *Compare United States v. Procter & Gamble,* 356 US 677, 683, 78 S Ct 983, 2 L Ed 2d 1077 (1958). As such, the furtherance of justice requires disclosure of *prior recorded statements.*" (Emphasis supplied.) 290 Or at 592.

■   The distinction between a grand juror's notes of a proceeding and the tape recordings of testimony is paramount in our holding today that defendant has no right to discover minutes taken by the clerk of the grand jury. Tape recordings are images of the witness' words made by a disinterested machine, and the chance for error through misperception, misimpression or misinterpretation, all qualities of the human condition, is slight.

In addition, allowing discovery of the clerk's notes intrudes upon the secrecy of the grand jury and, particularly, the secrecy of the individual grand juror appointed as clerk. In the majority opinion in *Hartfield,* the court acknowledged that maintaining secrecy of grand jury proceedings is a long-standing policy established by the courts. 290 Or at 586-87. In carving out an exception to that policy, the court stated:

"The dissent has traced some legislative history which supports a conclusion that some members of the Criminal Law Revision Commission were concerned about destroying secrecy of grand jury proceedings. Our examination of that history leads us to believe that perhaps those members were not aware of then existing statutes and case law above discussed which permitted some piercing of the veil. The 'crack' feared by Mr. Blensly had long existed.

"It is our conclusion that the legislative history does not lead unerringly either to the result we reach or that for which the dissent contends. Quite simply, we believe that either result is permissible, and we hold that the *tape* is discoverable in the circumstances in the furtherance of justice." 290 Or at 591. (Footnote omitted; emphasis supplied.)

The holding that taped grand jury testimony is discoverable for impeachment purposes does not mandate the conclusion that the Supreme Court meant to erode grand jury secrecy further to include discovery of the clerk's notes. The trial court was correct in denying defendant's motion for disclosure of the notes taken by the clerk of the grand jury.

■   In defendant's fourth assignment of error he contends that the two robbery convictions and sentences should have been merged into one conviction and sentence. Defendant argues that the two robberies were committed in the course of a single criminal episode with a single criminal objective and that under *State v. Perkins,* 45 Or App 91, 607 P2d 1202 (1980), the convictions should be merged for sentencing purposes. The record, however, does not support this contention. It is uncontested that, before entering the house, the two robbers took Hall's wallet. Once inside, the robber identified as defendant searched D'Vorshak at gun point.[4] In *Rolin v. Cupp,* 57 Or App 64, 643 P2d 1310, *rev den* 293 Or 373 (1982), the petitioner had entered a store and robbed the clerk at knife point. A customer then entered the store, whereupon the petitioner also robbed him. We held that the trial court did not err in entering separate convictions and sentences, stating:

> "Petitioner here robbed the store clerk and then robbed the customer. These were separate acts and reflect a choice by petitioner to carry out two separate criminal objectives. The second robbery was not part of, nor did it necessarily follow from, the first. *State v. Perkins,* 45 Or App 91, 607 P2d 1202 (1980), relied upon by petitioner, is distinguishable. In that case the defendant threatened two restaurant employes in the course of committing theft of restaurant property. The ultimate criminal objective was the theft, and we concluded that two separate robbery sentences were inappropriate. In the present case petitioner committed multiple offenses against multiple victims in a single criminal episode to further *multiple* criminal objectives. Separate sentences were appropriate, and the post-conviction court erred in merging the two robberies for purposes of conviction and sentencing." 57 Or App at 66-67.

In the present case, defendant had two criminal objectives: to take property from Hall and to take property from D'Vorshak. Therefore, the trial court properly entered two separate convictions for robbery in the first degree.

Affirmed.

---

[4] Robbery includes not only successful thefts, *e.g.,* the taking of Hall's wallet, but also attempted thefts, such as the search of D'Vorshak for property. *See* ORS 164.395(1), 164.415(1).