Argued and submitted August 18, 2015, affirmed April 12, 2017

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DONALD LEE COCKRELL,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR1101145; A154053

395 P3d 612

Zachary Lovett Mazer, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

**SERCOMBE, P. J.**

Following a jury trial, defendant was convicted of three counts of murder by abuse, ORS 163.115, and five counts of first-degree criminal mistreatment, ORS 163.205, primarily relating to the death of his three-year-old daughter, A.[1] In his first eight assignments of error, defendant contends that the trial court erred when it denied his motions for judgment of acquittal on the murder by abuse and criminal mistreatment charges. In addition, in his twelfth and thirteenth assignments, defendant asserts that the trial court erred in its response to a question from the jury during deliberations. We reject all of those assignments of error without discussion. In his ninth through eleventh assignments of error, defendant asserts that the trial court erred in refusing to order the state to provide notes of a witness, Smith's, grand jury testimony either before or after Smith testified at trial, and in refusing to conduct an *in camera* review of those notes. Finally, in his fourteenth and fifteenth assignments of error, defendant argues that the trial court erred in imposing sentences on two counts (Counts 4 and 6) that it had earlier ruled would merge into another count (Count 2). As explained below, we reject defendant's ninth through eleventh and fourteenth and fifteenth assignments of error and, therefore, affirm.

## I. BACKGROUND FACTS

A was found dead on Saturday, January 9, 2010. In the months before that, beginning in October 2009, A lived exclusively with defendant and his fiancée, Smith. The other children in the household were A's younger sister, K, Smith's young daughters E and J, and Smith and defendant's child, C. During that time period, A's mother saw her on only two to three occasions.

On January 9, based on a 9-1-1 call, emergency responders were sent to the home where defendant and Smith lived—an apartment under Smith's parent's house—having

---

[1] Two of the criminal mistreatment charges were related to defendant's other daughter, K. Defendant was also charged with three counts of aggravated murder relating to A's death. The jury acquitted defendant of the aggravated murder charges.

been told that a child had jumped on another child's head, and the child who had been jumped on was not breathing. Upon arriving at the scene, the circumstances did not appear to be consistent with the report they had received. A's body was lying on the floor and the pajamas she was wearing had been partly unzipped. She appeared emaciated and had many bruises on her face and body. It soon became clear that A had been dead for some time and that efforts to revive her would be futile. A lead paramedic made a call requesting that law enforcement response be expedited and, after talking to a police officer about what they had observed at the scene, medical personnel left. As part of the criminal investigation that followed, police officers separated defendant and Smith, took initial statements from them, photographed the scene, and called in the medical examiner.

An autopsy was conducted the following day by Dr. Larry Lewman. Lewman determined that the cause of A's death was physical and nutritional child abuse. He found in excess of 70 bruises on A's body. A was also emaciated, weighing only 21.25 pounds—so little that her weight was well below the percentiles reflected on growth charts so that she was, essentially skin and bones. There was no food in her digestive tract and she had suffered from starvation. She was also dehydrated and blood vessels in both of her eyes had burst. According to the doctor, the "terminal mechanism"—that is, the immediate mechanism of A's death—was bronchopneumonia and dehydration. In other words, A suffered from starvation that, in turn, compromised her system to such a degree that she ultimately succumbed to pneumonia.

On January 10, 2010, after the autopsy was performed, defendant and Smith were each interviewed by police. In her statement to police that day, Smith did not admit any culpability in A's death, nor did she provide any explanation for it. She did tell officers that A was very slow to eat and had not wanted to eat or drink over the past several days. She also said that A and K had developed coughs over the past few days and that A had been throwing up, dry heaving, and had woken up with "goopy" eyes. The interview was terminated after approximately 30 minutes; at that point, an officer began to question Smith about

the discipline that had been used in the household and she invoked her right to counsel. After the interview, defendant and Smith were arrested and criminally charged in relation to A's death. In December 2010, as part of an agreement to plead guilty to aggravated murder in relation to A's death, Smith made another statement to police and agreed to give evidence before a grand jury and at trial. The state presented Smith's testimony to the grand jury, which returned an indictment charging defendant with aggravated murder, murder by abuse, and first-degree criminal mistreatment.

Ultimately, Smith was one of the witnesses called by the state at defendant's trial on those charges. Among other things, Smith explained that during her relationship with defendant she was addicted to opiates. She engaged in drug seeking behaviors, going to multiple doctors to obtain prescriptions for opiates and also purchasing prescription opiates from a drug dealer. She kept a pill crusher, which defendant knew about, in the bathroom and would crush the pills and snort them. According to Smith, defendant was well aware of her drug addiction.

According to Smith, in August 2009, defendant, Smith, and the children moved into the apartment under Smith's parent's home. They were expected to pay rent, but did not do so as neither of them was working for much of the time they lived in the apartment. Eventually, Smith's parents insisted that they begin paying rent, and, in the middle of December 2009, defendant began working. He worked weekdays and had weekends and Christmas Day and New Year's Day off; on days that defendant worked, Smith and the children would all ride in the car to drop defendant off at a public transit station around 6:00 a.m. Smith and the children would meet defendant at the public transit station to pick him up again at approximately 8:30 p.m.

Smith explained that A had issues with eating; A would sit with food in front of her and would take large amounts of time to eat small amounts of food and had to be monitored and told to eat, chew, and swallow. A was spanked or sent to a corner for not eating. A was on a nutritional supplement, as had been recommended by a doctor, when defendant and Smith first got together as a couple. However, they

did not continue purchasing and giving her that supplement over the course of the relationship. Although A's eating trouble worsened in the months before she died, neither defendant nor Smith started her on the nutritional supplement again. Furthermore, through December and early January, both A and K lost significant amounts of weight. Smith did not monitor to make sure that A was eating.

Over the few weeks that defendant was employed, Smith essentially stopped taking care of the apartment. She did not do laundry or clean, and generally did not purchase food that had to be cooked. She also began helping her mother with her mother's business several hours a night, going upstairs to her parents' house when defendant was home—on weekends or around 8:30 on weeknights—leaving him alone with the children until she came back between midnight and 2:00 a.m. on weeknights. E was in school and would often sleep upstairs at her grandparents' house. However, the other children did not go to bed early, and defendant would generally put them to bed while Smith was upstairs.

Discipline in the home included spanking. Defendant and Smith also slapped the children in the mouth, hit them with fists, and "flicked" them in the mouth. Smith and defendant also made A run as a punishment; the last time A was made to run was during the week that she died. According to Smith, there were times that she found marks on the children after leaving them with defendant. She also saw defendant smash K's fingers and toes in the bathroom door. According to Smith, A did not have many bruises on her until December, when more bruises were inflicted.

A had been toilet trained, but, at least by December, began wetting her pants. When she had accidents, she was punished. Both Smith and defendant gave A bare-bottom spankings for having wetting accidents. A had wetting accidents in the days before she died. Smith punished A and also heard defendant hitting her.

Smith had scheduled an appointment for A with a doctor during the week before she died. She cancelled the appointment, however, because of the bruises covering A's body. On the Thursday evening before she died, A was

lethargic and had been vomiting. She was in the car to pick defendant up that evening; he tried to talk with her but she was not talking, her head was hanging down, and she looked very thin. Smith told defendant that A needed to go to the doctor and that Smith would not take her. Defendant did not do so. A had diarrhea, was coughing, and had hemorrhages in both of her eyes. On Friday, Smith did not bring A along when the family went to pick defendant up from public transit, instead putting her to bed and leaving her at the apartment. The next morning, A was found dead.

As noted, the jury ultimately found defendant guilty of multiple counts of murder by abuse and first-degree criminal mistreatment.

## II. ANALYSIS

### A. *Grand Jury Notes*

Before trial, defendant filed a motion asking the court to order disclosure to the defense "of the notes of the grand jurors who returned the indictment against him." The court held a hearing on the motion and, at the hearing, defendant offered and the court admitted as an exhibit a transcript of Smith's interview with police on January 10, 2010. Defendant argued that, in that interview, Smith had said nothing "that would result in an indictment of [defendant] for aggravated murder," yet, following Smith's grand jury testimony, defendant was indicted for that crime. In defendant's view, either Smith "testified inconsistently with [the January 10] statement in front of the grand jury, in which case it's an inconsistent statement of a witness to which we're entitled, or she testified consistent with this statement to the grand jury, in which case it's exculpatory, and it would be *Brady*[2] material, to which we would be entitled."

The court noted that it did not appear that Smith's January 10 interview was particularly favorable to defendant, observing that the part that was "most favorable to [defendant] is her statement that his children love him." The court stated that it could not tell what about the interview

---

[2] *Brady v. Maryland*, 373 US 83, 87, 83 S Ct 1194, 10 L Ed 2d 215 (1963).

defendant believed "would have to be contradicted" by Smith's grand jury testimony. Defendant responded that, during the interview, a detective asked Smith whether defendant "'feeds them,' [(the children)]" and "she said, 'Yeah.'"

"THE COURT: So that's saying he's never withheld food from them, in your interpretation.

"[DEFENSE COUNSEL]: 'He's actually—he's actually been making their food and stuff like that,' is what she says.

"I mean * * * she says, he's actually been making their food. He takes care of that. He's feeding the rest of the kids. He works most of the time."

Defendant took the position that, when a witness has made inconsistent statements at any point in the course of a criminal investigation or proceeding, then a defendant is entitled to grand jury notes because the "grand jury testimony [would be] necessarily inconsistent with at least some of" the other statements. The trial court denied the request for the grand jury notes, stating that it did not "think that there has been a demonstrated need for those notes, nor that there would be *Brady* material within those notes."

As described, Smith ultimately testified at defendant's trial. After the state's direct examination of Smith during trial, defendant renewed his motion for disclosure of the grand jury notes. In response to a question from the court asking defendant to explain what made him think that Smith's grand jury testimony was inconsistent with her other statements, defendant asserted that "we can't know whether it's inconsistent or not without looking at it." The court again denied the motion:

"[U]nless there's a showing that the notes will contain exculpatory evidence or impeachment information, grand jury notes are generally not ordered to be disclosed. And a showing must be more than a statement that you have a hunch or you think it must be true that they should contain some impeachment information.

"Since no sufficient showing has been made to persuade me that they would contain exculpatory evidence or impeachment information, I am, once again, ordering that the grand jury notes will not be disclosed."

As noted, in his ninth through eleventh assignments of error, defendant asserts that the trial court erred when it refused to order disclosure of the grand jury notes:

> "First, the trial court erred by refusing to order production of the notes after Smith testified at trial. Second, the trial court erred by refusing to conduct an *in camera* review of the notes to determine whether they contained exculpatory or impeachment information. Third, the trial court erred by refusing to order disclosure of the notes before trial, because there was a reasonable probability that the notes would reveal exculpatory or impeachment information."[3]

We review the trial court's ruling for legal error and are "bound by the trial court's factual findings, if supported by the record." *State v. Wixom*, 275 Or App 824, 828, 366 P3d 353 (2015), *rev den*, 359 Or 166 (2016).

> 1. *The trial court did not err in refusing to order disclosure of the grand jury notes under Oregon law.*

Relying on the Oregon Supreme Court's decision in *State v. Hartfield*, 290 Or 583, 624 P2d 588 (1981), defendant first asserts that the trial court should have ordered production of the grand jury notes after Smith testified at trial. In *Hartfield*, the Supreme Court recognized "the existence of a policy long established by courts to maintain the secrecy of grand jury proceedings." *Id.* at 586; *see* ORS 132.060 (juror oath includes promise to "keep secret the proceedings before you, the counsel of the state, your own counsel and that of your fellows"); ORS 132.210 ("A grand juror cannot be questioned for anything the grand juror says or any vote the grand juror gives, while acting as such, relative to any matter legally pending before the grand jury, except for a perjury or false swearing of which the grand juror may have been guilty in giving testimony before such jury."); *see*

---

[3] Defendant also contends that we cannot "apply a harmless error analysis to the asserted error" because the trial court "rejected defendant's pretrial request to make an offer of proof by calling Smith to ask her about her grand jury testimony" and "also refused to seal for the appellate record any notes concerning Smith's grand jury testimony." As we explain, we conclude that the court did not err and, consequently, do not consider defendant's contentions regarding the applicability of harmless error analysis.

*also* ORS 132.220.[4] It further observed, however, that there are occasions where "the veil of grand jury secrecy" may be pierced in the interests of justice. *Hartfield*, 290 Or at 588. In *Hartfield*, the court held, "in the furtherance of justice," that, "after a witness has testified on direct examination by the state, the defendant is entitled to examine an existing tape recording of that witness's testimony given in the grand jury proceedings that led to the return of the indictment upon which trial is held." *Id.* at 592; *see* ORS 132.220. Although the court observed that it did not, "by this decision, condone wholesale orders for disclosure of grand jury recordings[,]" it concluded that, "[w]here a witness before the grand jury has testified at trial for the state, a particularized need for disclosure exists for purposes of testing the witness's credibility" and, accordingly, "the furtherance of justice requires disclosure of prior recorded statements." *Hartfield*, 290 Or at 592.

According to defendant, "under *Hartfield*," he was entitled to "any notes concerning Smith's grand jury testimony * * * following [her] testimony on direct examination." However, grand jury notes and grand jury testimony are distinctly different, and *Hartfield*'s holding does not extend to grand jury notes.

As we explained in *State v. Goldsby*, 59 Or App 66, 71, 650 P2d 952 (1982), the "court's holding in *Hartfield* was limited to the discovery of an existing [recording] of grand jury *testimony*." (Emphasis added.) Although, under *Hartfield*, a defendant may be entitled to grand jury testimony, we "have refused to extend *Hartfield* to handwritten notes of grand jury testimony." *State v. Cox*, 87 Or App 443, 449, 742 P2d 694 (1987). There is a significant "distinction between a grand juror's notes of a proceeding and the tape recordings of testimony." *Goldsby*, 59 Or App at 72. Although

---

[4] ORS 132.220 provides:

"A member of a grand jury may be required by any court to disclose:

"(1) The testimony of a witness examined before the grand jury, for the purpose of ascertaining whether it is consistent with that given by the witness before the court.

"(2) The testimony given before such grand jury by any person, upon a charge against such person for perjury or false swearing or upon trial therefor."

"[t]ape recordings are images of the witness' words made by a disinterested machine, and the chance for error through misperception, misimpression or misinterpretation, all qualities of the human condition, is slight," *id.*, the same is not true for *notes* of grand jury testimony. "At best, [such] notes contain a summary of the substance of the evidence as presented by grand jury witnesses. * * * They are not the witness' words[.]" *Id.* at 71 (internal quotation marks omitted); *see also id.* at 72 ("The holding that taped grand jury testimony is discoverable for impeachment purposes does not mandate the conclusion that the Supreme Court meant to erode grand jury secrecy further to include discovery of the clerk's notes."). In light of *Goldsby* and *Cox*, defendant's contention that he is entitled to notes concerning Smith's grand jury testimony fails.[5] Accordingly, we reject his argument that, in light of *Hartfield*, the trial court erred in refusing to order disclosure of any grand jury notes after Smith testified at trial.

2. *Federal due process did not require disclosure of the grand jury notes.*

Defendant also asserts that, even if he was not entitled to disclosure of the grand jury notes under Oregon law, he was nonetheless entitled to them under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The state responds that federal due process principles did not require disclosure of the grand jury notes in this case.

---

[5] Defendant acknowledges our holdings in *Goldsby* and *Cox*. However, he asserts that the "limitation" of *Hartfield* discussed in those cases "is overly narrow and not supported by *Hartfield*." Defendant's brief does not explicitly assert that those cases were clearly wrong. However, to the extent that he intends to suggest that we should not follow those cases, as we have explained, "we must not, and do not, lightly overrule our precedents[.]" *State v. Civil*, 283 Or App 395, 416, 388 P3d 1185 (2017) (internal quotation marks omitted). Instead, we will overrule a case only when it is "plainly wrong, a rigorous standard grounded in presumptive fidelity to *stare decisis*." *Id.* at 406 (internal quotation marks omitted). We are not persuaded that our holdings in *Goldsby* and *Cox* were incorrect, much less plainly wrong and should be overruled, and reject defendant's assertions to that effect. Furthermore, to the extent that defendant attempts to distinguish those cases by drawing a distinction between a request for "*the notes of grand jurors themselves*" and "*any* notes concerning Smith's testimony," we are unpersuaded that there is any difference. (Emphases in original.) As we explained in *Goldsby* and *Cox*, *Hartfield* does not extend beyond recorded grand jury testimony to authorize disclosure of such notes.

As we have explained,

"[t]he United States Supreme Court has developed 'what might loosely be called the area of constitutionally guaranteed access to evidence' for criminal defendants. *United States v. Valenzuela-Bernal*, 458 US 858, 867, 102 S Ct 3440, 73 L Ed 2d 1193 (1982). To protect that right to evidence, the Court has held that 'the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' *Brady v. Maryland*, 373 US 83, 87, 83 S Ct 1194, 10 L Ed 2d 215 (1963)."

*State v. Nelsen*, 219 Or App 443, 452, 183 P3d 219 (2008), *rev den*, 346 Or 66 (2009).

"The due process right to prosecutorial disclosure of material, exculpatory evidence stems from *Brady*[.]" *State v. Bray*, 281 Or App 584, 599, 383 P3d 883 (2016). "A criminal defendant's constitutional entitlement to discovery is limited to information that is both (1) in the possession of the prosecution and (2) material and favorable to a defendant's guilt or punishment." *State v. West*, 250 Or App 196, 203, 279 P3d 354 (2012) (citing *Brady*, 373 US at 87).

"[U]nder *Brady*, the government has a constitutional duty to review its files and disclose any information that is in the possession of the government that is both material and favorable. However, once the state has fulfilled its affirmative duty to disclose material and favorable information in its possession, the defendant must make some further showing of favorability and materiality before additional requested material in the government's possession must be disclosed."

*Id.* at 204. "Evidence is 'favorable to the accused' if it is either directly exculpatory or could be used to impeach a government witness." *Bray*, 281 Or App at 599 (quoting *United States v. Bagley*, 473 US 667, 676-77, 105 S Ct 3375, 87 L Ed 2d 481 (1985)).

Materiality "includes not only relevance; it also encompasses a requirement that the state's failure to disclose the evidence be prejudicial." *Id.* As the United States Supreme Court explained in *Kyles v. Whitley*, 514 US 419,

434, 115 S Ct 1555, 131 L Ed 2d 490 (1995) (quoting *Bagley*, 473 US at 678),

> "[a]lthough the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require a demonstration by a preponderance that disclosure of the * * * evidence would have resulted ultimately in the defendant's acquittal[.] * * * [The] touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether a defendant would more likely than not have received a different result with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the [failure to provide the evidence] 'undermines confidence in the outcome of the trial.'"

*See Wood v. Bartholomew*, 516 US 1, 5-6, 116 S Ct 7, 133 L Ed 2d 1 (1995) ("[E]vidence is material under *Brady*, and the failure to disclose it justifies setting aside a conviction, only where there exists a reasonable probability that had the evidence been disclosed the result at trial would have been different." (Internal quotation marks omitted.)). "The dispositive question, thus, is whether there was a reasonable probability that the undisclosed evidence would have resulted in an acquittal or, put slightly differently, whether in the absence of the undisclosed evidence, the court nonetheless reached a verdict worthy of confidence." *Bray*, 281 Or App at 600 (internal quotation marks omitted); *see id.* (in a case where neither the trial nor appellate court knew "what the undisclosed evidence is," explaining that, "although there is a *possibility* that [undisclosed information] could have resulted in an acquittal, that possibility is a far cry from [the] *reasonable probability*" required to show due process violation (emphases in original)); *see also Smith v. Cain*, 565 US 73, 76, 132 S Ct 627, 181 L Ed 2d 571 (2012) ("[E]vidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict."); *Wood*, 516 US at 6 (observing that undisclosed information was "inadmissible under state law, even for impeachment purposes" and, as a result, the information at issue "is not evidence at all" (internal quotation marks omitted)); *State v. Deloretto*, 221 Or App 309, 322,

189 P3d 1243 (2008), *rev den*, 346 Or 66 (2009) (information that "would not have been admissible at trial is, in most instances and for that reason, immaterial—its existence could not have had any effect on the outcome").

In defendant's view, in this case, "[t]he record permits an inference that Smith's grand jury testimony would have been favorable to [him], either because it was potentially exculpatory or because it was inconsistent with other statements that Smith had made and thus was impeachment material." The state responds that the "trial court correctly concluded that defendant failed to show that notes of *** Smith's grand jury testimony [were] either favorable or material." We agree with the state.

As noted, at the pretrial hearing on defendant's motion for disclosure of the grand jury notes, defendant introduced a transcription from Smith's January 10 interview with officers regarding A's death. However, having reviewed that exhibit, we agree with the trial court that that interview does not give rise to an inference that Smith's later testimony before the grand jury was favorable to defendant. That is, the January 10 interview does not contain information that, in our view, shows that Smith either testified before the grand jury in a manner that could be considered exculpatory, nor does it give rise to an inference that the grand jury testimony would somehow contain impeachment evidence. Indeed, as the state points out and as defendant acknowledged at oral argument, the fact that the grand jury indicted defendant permits an inference that Smith's testimony before the grand jury was *not* favorable to defendant. Furthermore, like the trial court, we are unconvinced that the January 10 statement, which was relatively short and did not give the police much information, would have to be contradicted by the grand jury testimony. In sum, we agree with the trial court that, at the pretrial hearing, defendant did not make a plausible showing that the notes would contain exculpatory material.

Nor does our conclusion change in light of Smith's testimony at trial. As the state points out, "the notes would have led to impeachment evidence only if they reflected that Smith's grand jury testimony" was "inconsistent with

Smith's trial testimony." However, the only inference that arises from the record in this case is the opposite: that Smith's testimony before the grand jury and her trial testimony were consistent with each other. Indeed, as noted, when asked by the trial court to explain what made him think that Smith's grand jury testimony was inconsistent with her other statements, defendant stated that "we can't know whether it's inconsistent or not without looking at it." That is insufficient to demonstrate favorability. *See West*, 250 Or App at 204 (*"Brady* is not authority for a defendant obtaining evidence of unknown import to test whether it helps or hurts his case.").

Likewise, defendant in this case made no showing that there is any reasonable probability that disclosure of the notes might have made a difference in the outcome of the trial. Indeed, he does not contend that he did so but, instead, asserts that he was "entitled to the production of the grand jury notes and, in absence of access to them, did not have to show materiality." We disagree. In order to establish a due process violation, defendant was required to make some showing that the materials in question would have made a difference in the case. *See Bray*, 281 Or App at 600. He did not explain, in light of all the evidence presented to the jury, why the grand jury materials may, nevertheless, have made a difference in the case and, accordingly, been material. Because defendant failed to make any showing that the grand jury notes were either favorable or material, the trial court did not err in declining to order disclosure of those notes.

3. *Federal due process did not require the trial court to conduct an* in camera *review of the grand jury notes.*

Defendant nonetheless asserts that, in any event, due process *at least* required the trial court to conduct an *in camera* review of any notes of Smith's grand jury testimony. We review for legal error the trial court's determination regarding the sufficiency of defendant's showing of entitlement to an *in camera* review. *State v. Lammi*, 278 Or App 690, 694, 375 P3d 547, *adh'd to as clarified on recons*, 281 Or App 96, 380 P3d 1257, *rev den*, 360 Or 697 (2016). For the same reasons that he did not demonstrate a constitutional

entitlement to disclosure of the notes, defendant also did not demonstrate a constitutional entitlement to an *in camera* review of the grand jury notes. *See Wixom*, 275 Or App at 828 (defendant did not demonstrate constitutional entitlement to *in camera* review).

Similar to the showing required to establish the due process right to disclosure of the grand jury notes, to establish that his due process rights were violated by the trial court's failure to conduct an *in camera* review of those notes, defendant "must demonstrate that the [items of which he sought review] would have been material and favorable to his defense." *Id.* at 841-42; *see State v. Bittner*, 235 Or App 554, 564, 234 P3d 1012, *rev den*, 349 Or 370 (2010) (to show that the defendant's due process rights were violated by a failure to disclose identity of certain possible witnesses, "although it is impossible to say what the testimony of" those individuals "would have been," the defendant "was nevertheless required to at least make some plausible showing of how their testimony would be both material and favorable to his defense" (internal quotation marks, emphasis, and brackets omitted)). He failed to do so here. As we have explained, nothing about the materials defendant introduced at the pretrial hearing gives rise to a plausible inference that Smith's testimony before the grand jury was favorable to defendant. And, as discussed above, nothing about Smith's trial testimony changes that conclusion. Put simply, defendant failed to make any plausible showing that the grand jury notes would contain information material and favorable to his defense. *See Wixom*, 275 Or App at 842 (the "defendant's vague assertions in the trial court that there were 'things' in the DHS files that would lead to 'discussion about the complaining witness's character for truthfulness or the propensity for truthfulness or untruthfulness and possible false allegations' did not satisfy his burden" to demonstrate that materials "would have been material and favorable to his defense"). Accordingly, defendant did not establish constitutional entitlement to *in camera* review.

B.  *Imposition of Sentence on Counts 2, 4, and 6*

As noted, in his fourteenth and fifteenth assignments of error, defendant argues that the trial court plainly

erred by imposing sentences on Counts 4 and 6, which it had merged with Count 2. *See* ORAP 5.45(1); *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991). The state agrees that the trial court merged defendant's convictions on Counts 2, 4, and 6, each of which charged him with murder by abuse. However, the state disputes defendant's assertion that the court imposed sentences on each of those counts, contending that "the court ultimately entered just a single sentence," and, therefore, the error defendant identifies "simply did not occur."

The judgment at issue,[6] on Counts 2, 4 and 6, states that the "jury reached a unanimous verdict finding" defendant guilty, and that defendant "shall * * * receive a determinate sentence of life in prison, and shall be confined for a minimum of 25 years without possibility of parole, release to post-prison supervision, work release or any form of temporary leave." As to Count 2, the judgment states, "This is Alternative Theory 1 of 3 for the same crime. Convictions and sentences on Counts 2, 4 & 6 merge." (Boldface omitted.) The judgment identifies Count 4 as "Alternative Theory 2 of 3" and Count 6 as "Alternative Theory 3 of 3 for the same crime," and, for each of those counts, states that "[c]onvictions and sentences on Counts 2, 4 & 6 merge."[7] (Boldface omitted.)

Even assuming defendant is correct that the trial court plainly erred in this case, *see State v. Thomas*, 238 Or App 360, 363, 242 P3d 721 (2010) (where a court merges guilty verdicts, it must enter a single conviction for those merged counts and "concomitantly, a single sentence thereon"); *see also State v. Earls*, 246 Or App 578, 586 n 11, 267 P3d 171 (2011) ("[A]s we have explained previously, sentences do not merge[.]"), we would not exercise our discretion to correct that error. In considering whether to exercise our discretion to correct plain error, we consider, among other things,

---

[6] The trial court's second amended judgment is the operative judgment on appeal. The court had earlier entered a judgment reciting that the convictions on Counts 2, 4, and 6 merged, but purporting to sentence defendant concurrently on those merged counts. The parties sought a corrected judgment and the court entered the second amended judgment.

[7] As we have explained, it is actually guilty verdicts, as opposed to convictions, that merge. *See State v. Lepierre*, 235 Or App 391, 395, 232 P3d 982 (2010). Here, we echo the terms used in the judgment.

"the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring preservation have been served in the case in another way, *i.e.*, whether the trial court was, in some manner, presented with both sides of the issue and given an opportunity to correct any error."

*Ailes*, 312 Or at 382 n 6. In this case, those factors weigh against the exercise of our discretion. In particular, we do not consider the error in this case to be grave and, in our view, the ends of justice and judicial efficiency do not weigh in favor of correcting it. *Cf. Thomas*, 238 Or App at 364 (concluding that judicial efficiency weighed in favor of correcting a plainly erroneous sentence rather than affirming "with the surmise that defendant might, at some time in the future, seek modification of the judgment under ORS 138.083(1)(a)"). As noted, although the judgment purports to merge three sentences for murder by abuse as well as the convictions, it is also clear from the judgment that each of the three counts in question is an alternative theory for the same crime and that the three convictions merge. The judgment states, in bold print headings, that Counts 2, 4, and 6 merge, and repeats at the end of each paragraph relating to those counts that the convictions on Counts 2, 4, and 6 merge. Under the circumstances, we decline to exercise our discretion to correct the purported error on merger of the sentences.

Affirmed.